**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| ALONGI, | x | |
| | x | |
| | x | Civ. A. No.02-3090 |
| v. | x | |
| | x | |
| HENDRICKS, et al., | x | |
| | x | |
| KAMIENSKI, | x | |
| | x | |
| | x | Civ. A. No. 02-3091 |
| v. | x | |
| | x | |
| HENDRICKS, et al., | x | **OPINION** |
| | x | |

**CHESLER, District Judge**

**I.     INTRODUCTION**

This matter comes before the Court on the joint application of petitioners Paul Kamienski and Anthony Alongi (hereinafter "petitioners") for a writ of habeas corpus pursuant the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d).  For the reasons that follow, the petitioners' application is **DENIED**.

**II.     FACTS**

**A.     The Trial**

On October 7, 1987, petitioners Paul Kamienski and Anthony Alongi, along with Joseph Marseno[1], were indicted by an Ocean County grand jury for, among other things, the September

---

[1]Mr. Marseno is also referred to in the papers as "Marsieno" and "Marzeno," and is also known as Michael Testa.  The Court shall refer to this defendant as Mr. Marseno.

19, 1983 murders of Henry and Barbara DeTournay.  (A1-4.)[2]  An eighteen-day trial ensued, at

which the following facts were developed.

> i.     **The Evidence**

>> a.     **Physical Evidence**

On September 24, 1983, the body of Henry Nicholas ("Nick") DeTournay was found

floating on or near the surface of Barnegat Bay by a volunteer fireman with the East Dover Fire

Department Marine Unit, Richard Stevens.  (3T at 123:22-131:1; 4T at 108-109.)[3]  The body was

fastened to a cinder block by a rope three to four feet in length (3T at 126:13-18; 141:18-142:6)

about one-half mile from petitioner Alongi's Baron Street, Toms River lagoon-front residence, in

the area where petitioner Alongi's lagoon enters the bay.  (See S-3 and S-4.)  The following day,

Stevens found the body of Mr. DeTournay's wife, Barbara DeTournay, which had washed up

onto Sedge Island (4T at 23:3-17; 27:14-17), an island in Barnegat Bay (3T at 131:19-132:21; 4T

at 23:3-24:14) approximately one-half mile from the Lavallette, New Jersey marina where

petitioner Kamienski kept his boat.  (See S-3 and S-4.)

Henry DeTournay's body was wrapped in a blue sleeping bag (4T at 182:16-182:24),

which was secured around the body by white clotheslines (4T at 184:18).  Under the blue

sleeping bag, the body was wrapped in a rust-colored blanket with a satin border or trim (4T at

188:7-15), and below that was a towel with a flower or rose pattern (4T at 185:7-10).  A shoe

was missing from Mr. DeTournay's left foot.  (4T at 188:20-22.)

---

[2]The State's appellate appendix, which is found at Appendix II to the State's brief, shall be referred to as "A___."

[3]Trial transcripts, of which there are 24 in this case, are referred to as "__T" followed by page and line numbers.

Mr. DeTournay's wallet contained a business card for petitioner Kamienski, President of Kamienski Funeral Homes, Inc., with a notation that read "Apt. in Garfield (478-2034)" and "Paul and Donna. Boat 793-0312." (7T at 158:14-159:3.) It also contained a piece of paper with directions to petitioner Alongi's Toms River address. (7T at 160:3-8.) Other pieces of paper were also found on Mr. DeTournay, which reflected phone numbers for petitioner Alongi, for a phone booth near his in-laws' Newark residence, and for petitioner Kamiesnki's beeper number. (7T at 162:2-21; 163:23-164:22.)

Barbara DeTournay's body was wrapped in a rust colored blanket with satin trim that was secured in place by ropes. (5T at 24:11-33.) When the wrappings were removed, Barbara DeTournay was observed wearing deck-type corduroy sneakers, crew-type socks, shorts with a belt, a T-shirt with a pocket, jewelry, and a wristwatch. Henry DeTournay's left shoe was found inside the blanket. (5T at 31:6-21.) Both victims died from multiple gunshot wounds. (5T at 137:18-139:19; 131:14-18.) The same type of rope secured the wrappings on both bodies. (5T at 109:6-12.)

Detective Thompson testified about the recovery of a 21-foot black marquis boat, bearing a specific hull number and New Jersey registration number (5T at 47:9-15) that belonged to the brother of petitioner Alongi's girlfriend and present wife, Jackie Sullivan. (See 7T at 174:19-175:22.) Fingerprint and serological tests, which would show the presence of semen, saliva, or blood, that were performed on the boat months after the murders were negative. (5T at 46:6-21.) However, a Luminol spray test showed blood stains over certain areas of the deck carpeting of the boat. (5T at 48:12-19.) FBI laboratory test reports revealed insufficient quantities of blood, hair, and fibers collected from the boat to be compared with those found on the blankets and

towel that were found over the bodies.  (5T at 52:5-53:13.)

Dr. Saliendra K. Sinha performed autopsies of the bodies on September 26, 1983. (5T120:19-122:13; 124:13; 134:13-18.)  Dr. Sinha concluded that Henry DeTournay was choked prior to his death (5T at 125:19-130:23) and that the cause of death was massive hemorrhage due to multiple bullet wounds (5T 131:14-18).  The autopsy on Barbara DeTournay showed the cause of death to have been multiple bullet wounds.  Dr. Sinha opined that, at the time of the autopsy, the bodies had been exposed to the water for approximately one week, since approximately September 19, 1983.  (5T at 132:12-21; 147:1-7.)

### b.    Petitioner Kamienski

During the investigation of the DeTournays's murder, investigators interviewed petitioner Kamienski.  He stated that knew the DeTournays (7T at 204:9-23) and that they arrived in the Ocean Beach, New Jersey area around September 10, 1983 and that they had visited Alongi's house by boat (7T at 206:12-207:2).  He further stated he had purchased drugs from the DeTournays and he knew they wished to sell cocaine.  (7T at 213:23-214:20.)  He later stated they called him during the week prior to September 19, 1983 at his apartment in Garfield to obtain a scale to weigh cocaine.  (7T at 219:14-221:2.)

### c.    Christine Longo

Barbara DeTournay's sister, Christine Longo, lived with their parents, the Boutsikaris's, in Newark, New Jersey.  (5T at 172:9-20.)  She testified that, around Labor Day, 1983, the DeTournays were visiting the Boutsikaris residence, and they were interested in selling cocaine at that time.  (5T at 173:18-23.)  She stated that on September 7th or 8th, 1983, they traveled to the New Jersey shore where they attended a party on a "funeral director's boat" whose name was

"Paul." (6T at 31:12-32:20.) Upon her return, Barbara DeTournay told her sister she was "going to make a big drug deal." (6T at 33:20-34:24.)

Longo stated that on September 17, 1983, Henry DeTournay received a call at the Boutsikaris residence and went to his "office," a phone booth just outside the residence. Upon his return, the DeTournays packed and prepared to leave "for the shore." Another call came in at approximately 9:00 at night, they left the Boutsikaris residence, and were not seen thereafter. (6T at 37:21-40:5.) The following week, the Boutsikaris's received phone calls from someone named "Jeff," who was inquiring about the DeTournays's whereabouts and was concerned that he "got ripped off by them." (6T at 88:1-88:15.)

### d.    Arthur "Buddy" Lehman

Arthur "Buddy" Lehman, a witness for the State, knew the petitioners socially. (15T at 47:6-51:11.) He stated after the spring of 1983, Marseno, Alongi , Kamienski, Jackie Sullivan, and Donna Duckworth were "hanging out together almost on a constant basis . . . .  They were spending seven days a week together. . . ." (15T at 54:18-55:18.) He stated he tried to buy cocaine from Marseno and Alongi around September 10 to 15, 1983, and was assured that within the week, they would have "kilo quality coke for you at about one thousand dollars less an ounce than you're paying now . . . ." and that they would have "a ton [of] South Florida Coke. . . ." (15T at 59:1-14; 60:2-8.) On September 18, 1982, Lehman was assured that Marseno would have the cocaine "within a few days . . . ." (15T at 61:9-22.) On September 19, 1983, Alongi told Lehman he had the product, but that "[my] partner's up in Newark.  He'll be back in a few days," when they would meet. (15T at 62:11-19.) On September 24, 1983, when Henry DeTournay's body was recovered but not Barbara's, Kamienski told Lehman "my friends from

5

Florida have been murdered." (15T at 63:3-64:22.) In early October, 1983, Lehman received one ounce of "kilo quality cocaine," which was of high potency and rock-like in texture, on credit from Alongi. (15T at 65:20-67:12.)

### e.      Sidney Jeffrey, III

Sidney Jeffrey, III was the courier of the cocaine from Florida to be sold by the DeTournays' in New Jersey. He testified under immunity. On September 11, 1983, Barbara DeTournay told Jeffrey she had contacted persons in New Jersey who were interested in buying three kilos of cocaine. (8T at 135:1-137:10.) Jeffrey obtained the three kilos and met the DeTournays at a hotel in Toms River, New Jersey. (8T at 136:7-13.)

On September 18, 1983, Henry DeTournay picked Jeffrey up at the hotel and advised him that the purchasers were not ready because they "were getting their money together" (8T at 139:9-140:21) and that they were having trouble getting the money (9T at 16:8-23). Jeffrey stated that, on September 19, 1983, Barbara arrived at Jeffrey's hotel and advised she was to pick up the cocaine and wait to be picked up. (8T at 142:7-144:12.) Barbara took the cocaine and left in a car that fit the description of petitioner Alongi's car. (8T at 147:18-151:3; 9T at 211:1-6.) The DeTournays never returned to the hotel or contacted him.

Jeffrey called the Boutsikaris residence several times looking for the DeTournays. During one of these calls, he learned that Henry's body had been found, and he then returned to Florida. (8T at 152:7-155:24.)

### f.      George F. Hunt, Jr.

In September 1983, George F. Hunt, Jr. lived across the street from petitioner Alongi. At trial, Hunt testified that on September 19, 1983 while working in his home office, which

6

overlooks Alongi's residence (9T at 233:11-23), he observed a man who he identified as Henry DeTournay (9T at 244:5-22), approaching Alongi's house (9T at 245:23-246:8).  Alongi appeared, greeted the individual, and the two went to the back of the house.  (9T at 243:6-244:4.) Hunt did not see the individual again until he noticed his picture in the newspaper and called the authorities.  (9T at 244:5-22.)  Hunt stated he had never seen Alongi operate a boat in the two to three years he had lived across the street from him, but had seen Alongi operate a boat twice in the two weeks leading up to September 19, 1983.  (9T at 250:1-251:2.)  Hunt spoke with Alongi between September 19, 1983 and the time he saw Henry DeTournay's picture in the paper, about Alongi installing a new rug in the garage of his house.  (9T at 253:9-255:3.)

###### g.        Donna Sue Duckworth

In September of 1983, Donna Sue Duckworth lived with petitioner Kamienski in his Garfield, New Jersey apartment and on his boat.  (11T at 4:13-5:12.)  She testified that, during their six-year relationship, they were "together every day, all the time, about 24 hours a day . . . ." (11T at 6:17-19; 41:7-12.)  Duckworth first met Alongi and Marzieno during the Summer of 1983 on Kamienski's boat when she and Kamienski had purchased cocaine from them.  After that meeting, the four were in touch "almost every day" socially and for the purpose of buying cocaine.  (11T at 14:9-15:25.)  Duckworth met the DeTournays in the summer of 1982 at the marina where both they and Kamienski docked their boats.  Kamienski, Duckworth, and the DeTournays maintained social contact and used cocaine together.  (11T at 16:12-17:10.)

On September 3, 1983, Henry DeTournay asked Kamienski if he knew anyone interested in purchasing three kilos of cocaine, to which Kamienski replied affirmatively.  (11T at 20:8-14.) On September 5, 1983, Kamienski, Duckworth, and the DeTournays took a boat ride over to

7

Alongi's house and Kamienski introduced the DeTournays to Alongi.  During the introduction, Kamienski vouched for the both the DeTournays and for Alongi.  (11T at 29:1-8.)

On September 9, 1983, while at his Garfield, New Jersey apartment, Kamienski received a phone call from Nick DeTournay and she heard Kamienski say "[n]o, he didn't have a scale and to get off the boat."  (11T at 33:20-34:25.)  Duckworth's original statement regarding the September 9, 1983 telephone call included a reference to co-defendant Alongi that suggested he was also on Kamienski's boat with DeTournay during the call (9T at 85:7-9) but the trial court suppressed the reference to Alongi (2T at 204:4-206:16).  At trial, Kamienski stated that Nick DeTournay never told him who was on the boat with him.  (19T at 52:11-24.)  Duckworth and Kamienski returned to the New Jersey shore later that day.  (11T at 35:13-17.)

Duckworth testified that, during a September 17, 1983 party at Alongi's house, there was talk of "a good deal coming down" and "good coke . . . coming into town. . . ."  (11T at 36:13-37:16.)  On September 18, 1983, Marseno, Alongi, Kamienski, Jackie Sullivan, and Duckworth met at the Holiday Inn in Toms River.  (11T at 37:17-39:8.)

On September 19, 1983, Kamienski told Duckworth that she would be left at a friend's house for the day.  She stated this was unusual since Kamienski "never let me really out of his sight . . . ." and she always drove Kamienski's car because his license was suspended.  On September 19, 1983, however, Duckworth spent the day at her friend's house, and Kamienski picked her up around dusk, and they went to Alongi's house.  (11T at 40:18-42:3.)  Upon entering Alongi's house, Kamienski directed Duckworth to wait upstairs with Alongi's girlfriend, Sullivan.  (11T at 42:4-8.)  When Sullivan attended a phone call, Duckworth went downstairs looking for Kamienski.  (11T at 42:10-18.)  She walked out onto the sidewalk where she saw

8

Kamienski standing by the dock, looking toward the boat.  (11T at 42:20-24.)  She stated:

> I saw Tony [Alongi] in the boat and I saw what appeared to me to
> be a body shape in the sleeping bag and he started lunging out of
> the boat and . . . I turned around and started going back to the
> house real fast.

(11T at 43:1-8.)  She stated that defendant Alongi lunged at her and frightened her, but

Kamienski assured him, "she's alright."  She stated the boat was wet and that "everything

appeared wet."  (11T at 43:9-44:1.)

Alongi spoke with Duckworth after this incident, showed her a gun, and told her "if [she]

didn't be quiet [she would ] end up like her friends," and "Paul wouldn't be able to save [her] if

[she] opened her mouth. . . ."  (11T at 44:4-46:18.)  When Duckworth and Kamienski left

Alongi's house that night, Duckworth questioned Kamienski about what she had seen.  He stated

"that he couldn't control what happened . . .," that "Nick went first, Barbara didn't suffer . . .,"

and "[i]f we didn't shut up that he wouldn't be able to save [Duckworth] or himself."  (11 at

47:11-16.)

Duckworth and Kamienski returned to Kamienski's boat at the Ocean Beach Marina.  She

stated that a teak box containing cleaning rags and other supplies was kept on the catwalk to the

boat and was used as a step in boarding the boat.  She stated that the box was missing that night

and the boat had been moved forward.  (11T at 48:14-49:14.)

On September 24, 1983 (the day Henry DeTournay's body was recovered), while dining

at the Top O' the Mast restaurant in Seaside Park, New Jersey, Duckworth and Kamienski were

informed that the police were there for Kamienski.  Kamienski directed Duckworth to call

Alongi, who arrived within ten minutes.  Alongi directed Duckworth to drive Kamienski to the

9

police station.  (11T at 51:21-54:5.)

On October 1, 1983, Marseno, Kamienski, Alongi, Sullivan, Duckworth, and Jeannie Yurcisin (Marseno's girlfriend) met at the Top O' the Mast.  Marseno stated that bodies were found and that "[t]hey were like scared puppies . . . it was easy."  (11T at 57:1-23.)  Marseno told Duckworth she should "straighten up or [she] could end up like them . . . ."  He then grabbed her jaw saying she should wise up.  (11T at 58:13-59:23.)

At around this time, there was an increase in the supply and quality of cocaine. Duckworth described the cocaine as "stronger" and "in rock form."  (11T at 61:10-11.) Duckworth stated that Kamienski had been looking for a cocaine grinder used to grind the rock cocaine into powder.  (11T at 62:7-12.)

Duckworth further testified about the blankets and rope found with the DeTournays' bodies.  Specifically, Exhibit S-34 in evidence depicted a blanket with some rope wrapped around it.  Duckworth identified S-34 as the sleeping bag seen on the boat at defendant Alongi's house on September 19, 1983.  S-37 depicted a towel recovered with the DeTournay's bodies, which had been seen before in the teak box where rags were kept for Kamienski's boat.  Also, she stated the blankets recovered with the DeTournays's bodies were similar to those on Kamienski's boat.  (11T at 69:13-72:7.)  Moreover, Duckworth stated she had been boating since age five and was familiar with how to secure boats and the knots boaters used to secure them. Kamienski used a peculiar "hitch" knot to secure a boat, rather than that taught to Duckworth.  S-35 in evidence depicted the bodies wrapped and secured by rope in hitch knots, the same knots that Duckworth stated Kamienski tied.  (11T at 67:20-68:25.)

10

### h.     Jean Yurcisin

Jean Yurcisin, Marseno's companion, stated that, on September 16 or 17, 1983, she was at a party at Alongi's house where Marseno told her he was expecting to get a great deal of cocaine that was "supposed to burn at 88 to 92%, and it was coming up from Florida from friends of Paul [Kamienski] and Donna's." (15T at 338:20-341:16.) She stated, on September 18, 1983, Marseno told her to pick him up at the Holiday Inn and that she should not be late because "he would be carrying." (15T at 342:13-25.) When she met him, Marseno told her "they wanted to see the money first, and that he – he had no intention of paying them any money, that he would kill them before they got any of his money." (15T at 343:1-14.) Marseno was carrying a briefcase with no money, but only a gun inside. (15T at 343:15-344:17.) The following day, Monday, September 19, 1983, Marseno called Yurcisin at about 10:30 p.m. and told her "the deal went down," and that he would be leaving town because things were "going to be getting pretty hot." (15T at 345:5-20.)

At the September 24, 1983 meeting at the Top O' the Mast restaurant, Yurcisin stated Alongi asked her where Marseno was and stated that a body was found and it was very important he speak with Marseno. (15T at 345:18-346:22.) This was the night police questioned Kamienski. (11T at 51:21-54:16.) Yurcisin further stated that Marseno gave cocaine to Alongi and Kamienski ounces at a time but did not take money in return. (15T at 353:25-356:7.)

### ii.     Closing Arguments

At closing arguments, the prosecutor stated as follows:

> Paul Kamienski was there when [the DeTournays] were murdered. Paul Kamienski was there because he put this deal together, he had brokered it, the DeTournays trusted him. He was the person they trusted.

11

. . .

Am I going to say does Paul Kamienski know that they're going to get killed? I don't think so. Not from the evidence and testimony that I've heard. Paul Kamienski is there because he is part and parcel, he put this drug deal together, he made it work, he was there.

And you know what, Tony [Alongi] and Joe [Marseno] they didn't have any money, but you know what they had, they had a gun and they killed the DeTournays. They murdered them. They murdered them in cold blood. And Kamienski was there and that didn't end the murder, a bullet through the chest or through the head did not end a murder, a murder is finished and the murder ended when that body is disposed of. And I submit to you that's what occurred at that point in time was that Paul Kamienski assisted Marzeno and Alongi in getting rid of the bodies. That he assisted, he helped, he rendered his countenance to that in getting rid of the bodies. He was there. He never - - I'll say this, he never expected it to happen, he didn't expect them to be murdered. He said that to Donna as soon as they got outside. I couldn't control the situation, but it happened. And he was there and he helped dispose of the bodies.

(19T at 276:5-277:20.)  The prosecutor further argued:

Sidney Jeffrey brought the cocaine up from Florida . . . [the DeTournays] were introduced for the purpose of that drug deal by Paul Kamienski to Anthony Alongi and Joe Marzeno. That Paul Kamienski vouched for them. In that deal he was the common thread in setting that deal up, he vouched for both sides . . .

(19T at 295:6-15.)  He went on:

And I've indicated to you that I don't think that Paul Kamienski - - I don't think that [he] was a part of a conspiracy to murder those people, I think he very clearly was a part of the conspiracy, that second conspiracy to possess that cocaine with intent to distribute it. He, in fact, received those ounces of cocaine . . . .

(19T at 296:17-25.)

### iii.    The Jury's Verdict and the Judgment N.O.V.

On November 18, 1988, the jury found petitioners Kamienski and Alongi guilty as

accomplices of murder in the first degree (Counts One and Two), felony murder (Count Five),

and conspiracy to possess cocaine with intent to distribute (Count Six).  They were found not

guilty of conspiracy to commit murder and conspiracy to commit robbery.  (A9, A13, A38, A47.)

Marseno was found guilty, as the primary actor, of murder in the first degree (Counts One and

Two), guilty of murder during the commission of a felony (Count Five), and conspiracy to

possess cocaine with intent to distribute (Count Six).  He was found not guilty of conspiracy to

commit murder, and conspiracy to commit robbery.  (A5, A29.)

After the verdict, all of the defendants moved for new trials and for judgment N.O.V.  On

December 21, 1988, Judge Perskie entered judgments of acquittal in favor of Alongi and

Kamienski on Counts One, Two, and Five, the murder and felony murder charges (A37, A47)

and denied defendants Marseno's motion for acquittal.  In granting the judgment N.O.V., the trial

court reasoned as follows:

> The verdict acquitting defendants Alongi and Kamienski of the
> conspiracy to rob or to murder would preclude a retrial on the
> theory that they were chargable as principals for the murders or
> felony murders by reason of their *conspiracy* status.  This would
> leave for retrial only the charge that these defendants were guilty of
> the murders and felony murders as *accomplices.*  There is not
> sufficient evidence to support such a verdict.  While it can be
> argued that all of the conduct of defendants Alongi and Kamienski
> before the afternoon of the 19th is consistent with accomplice
> liability and the requisite purpose to promote or facilitate the
> crimes of robbery and murder, the verdict acquitting them of
> conspiracy to rob or to murder renders this theory untenable.  If
> defendants Alongi and Kamienski did not conspire to commit these
> crimes, they could be charged therewith in a new trial only as
> accomplices *and only on the basis of their actions during the
> commission of the crimes.*  There was no evidence of their conduct

13

> during the commission of the crimes except, inferentially, their
> presence at the scene, which would not by itself suffice to sustain a
> verdict.  The State relies upon this inference to sustain the further
> inference that defendants Alongi and Kamienski assented to the
> robbery and murders, lent to the crimes their countenance and
> approval, and thereby are chargable therewith as accomplices.
> This latter inference, however, rests not upon any *evidence* of their
> presence at the scene of the crimes but upon the *inference* of their
> presence.  Thus there does not appear to be sufficient evidence to
> establish the requisite purpose to promote or facilitate the crimes of
> robbery or murder, as opposed to the crime of possession of
> controlled dangerous substance with intent to distribute, in the
> conduct of defendants Alongi and Kamienski prior to or during the
> meeting on the afternoon of the 19th.

State v. Kamienski, 254 N.J. Super. 75, 97-98 (App. Div. 1992) (emphasis added) (quoting trial

court's transcript of judgment N.O.V.).

## B.    The State's Appeal of Judge Perskie's Judgment N.O.V. Ruling

The State appealed the trial judge's ruling to the New Jersey Appellate Division, arguing

the judgment N.O.V. should be reversed and the verdicts reinstated because (1) there was no

inconsistency in the verdicts or, alternatively, inconsistent verdicts do not vitiate an otherwise

reasonable verdict, (2) there was sufficient evidence upon which a jury could find Alongi and

Kamienski guilty as accomplices to murder, and (3) defendants were properly found guilty of

felony murder as accomplices to a robbery.  Kamienski, 254 N.J. Super. at 82-83.  In a published

opinion, the Appellate Division reversed the trial judge and reinstated the guilty verdicts.

Relevant portions of the Appellate Division's opinion are discussed in detail below.  Petitioners'

application for certification to the New Jersey Supreme Court was denied.

## C.    Alongi and Kamienski's Joint Petition for Post-Conviction
##       Relief – The Brady-Giglio Materials

On April 10, 1997, Alongi and Kamienski filed a joint petition for post-conviction relief,

arguing the State failed to disclose information to the defense in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963) and <u>Giglio v. United States</u>, 405 U.S. 150 (1972).  They argued the State (1) withheld information that Donna Sue Duckworth would receive benefits from the state in connection with an unrelated drug charge in return for testimony against Messrs. Kamienski and Alongi, (2) failed to correct Ms. Duckworth's testimony that no such promises were made; and (3) failed to disclose Ms. Duckworth's previous grand jury testimony.  The details of this petition and related proceedings are discussed <u>infra</u> at Part III.D.

### D.    The Instant Applications

On June 26, 2002, petitioners filed their applications for <u>habeas</u> <u>corpus</u> relief.  Broadly stated, petitioners argue:  (1) they present cognizable and reviewable claims (Petitioners' Brief ("Pb") at 22-31, Point I); (2) the State's evidence was insufficient to establish guilt of murder (Pb at 32-48, Point II); (3) the jury selection process violated petitioners' Sixth and Fourteenth Amendment rights (<u>id.</u> at 49-61, Point III); and (4) petitioners' Due Process rights were violated by the suppression of <u>Brady</u>-<u>Giglio</u> material (<u>id.</u> at 62-69, Point IV).  Petitioner Kamienski further argues the denial of his severance and mistrial applications violated his right to a fair trial under <u>Bruton v. United States</u>, 391 U.S. 123 (1968).  (<u>Id.</u> at 70-79, Point V.)  Petitioner Alongi argues he was denied effective assistance of counsel.  (<u>Id.</u> at 80-83, Point VI.)  On October 15, 2003, petitioner Kamienski filed an "Amendment & Supplement to Petition" asserting new grounds for relief.  By Order and Opinion dated May 10, 2005, the Court disallowed portions of the Supplemental Petition as untimely, but allowed certain others.[4]  The allowed amended claims

---

[4]By letter dated June 16, 2006, petitioner Kamienski sought leave to submit a motion for reconsideration of this Court's May 10, 2005 Order barring certain claims under the AEDPA's one-year statute of limitations.  (Letter of Timothy J. McInnis, Esq. dated June 16, 2006

are addressed infra.

## III.    DISCUSSION

### A.    Standards Under Section 2254(d)

The AEDPA provides:

> (d) An application for a writ of habeas corpus on behalf of a person

---

("McInnis Ltr.") at 1.) Kamienski argues that, in view of the Supreme Court's ruling in House v. Bell, -- U.S. --, 126 S.Ct. 2064, 2006 WL 1584475 (2006), this Court applied the incorrect standard in ruling that the AEDPA limitations period governing his untimely application to amend his petition to add a Brady claim was not tolled by the "actual innocence" doctrine. Specifically, he argues the Court considered the proposed Brady evidence in isolation rather than making a "holistic judgment about 'all the evidence,'" as required by House.

Relief by way of a motion for reconsideration is "an extraordinary remedy" that is to be granted "very sparingly." See NL Indus. Inc. v. Commercial Union Ins. Co., 935 F. Supp. 513, 516 (D.N.J. 1996); Maldonado v. Lucca, 636 F. Supp. 621, 630 (D.N.J. 1986). A motion under Rule 7.1(g) may be granted if: (1) "an intervening change in the controlling law has occurred; (2) evidence not previously available has become available; or (3) it is necessary to correct a clear error of law or prevent manifest injustice." Database Am., Inc. v. Bellsouth Adver. & Publ'g Corp., 825 F. Supp. 1216, 1220 (D.N.J. 1993); North River Ins. Co. v. CIGNA Reinsurance Co., 52 F.3d 1194, 1218 (3d Cir 1995). Local Rule 7.1(g) requires the moving party to "set[] forth concisely the matters or controlling decisions which counsel believes the [court] has overlooked." L. Civ. R. 7.1(g). For the purpose of this discussion, the Court will assume that House can be applied retroactively to the Court's May 10, 2005 Opinion and Order.

Petitioner's arguments do not warrant reconsideration of the May 10, 2005 Order. In its May 10, 2005 Opinion, the Court held that the petitioner did not show it was "more likely than not that no reasonable juror would have convicted him in light of the new evidence." (May 11, 2005 Opinion at 18.) While the Court did not articulate the exact standard later set by the House court, it did not limit its analysis to the proposed new evidence in isolation. Indeed, the Court expressly considered other evidence before the jury, as demonstrated by its reasoning that "the jury in this case heard testimony from Detective Thompson that the FBI's tests on everything that was submitted with regard to the entire investigation showed that there were no comparisons that could be made between the items taken from the victims and the Defendants." (See May 11, 2005 at 4-5.) Nonetheless, even if the Court applied the incorrect standard, after reviewing the totality of the evidence, including the evidence discussed in part III.B.iv. of this Opinion and Detective Thompson's testimony cited above, the Court concludes that evidence of the proposed FBI lab tests and attendant documents does not create a likelihood that a reasonable jury would find petitioner innocent. See House, 126 S.Ct. at 2077. The Court, therefore, need not reach the issue of whether or not a showing of actual innocence tolls the AEDPA limitations period. For this reason, the Court denies petitioner's request for leave to file a motion for reconsideration.

> in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254.

A district court may grant a writ under the "contrary to" clause of Section 2254(d) if it concludes the state-court decision contradicts the governing law as set forth by the Supreme Court, or differs from a decision of the Supreme Court made on materially indistinguishable facts. Williams v. Taylor, 529 U.S. 362, 412-13 (2000). Under the "unreasonable application" clause, a court may grant a writ if the state court identified the correct Supreme Court precedent, but applied it to the facts in an unreasonable manner. Id. at 413. It may not grant relief, however, "unless a state court's application of clearly established federal law was objectively unreasonable; an incorrect application of federal law alone does not warrant relief." Keller v. Larkins, 251 F.3d 408, 418 (3d Cir. 2001). A court may also grant a writ under Section 2254(d)(2) if the state court decision was based on an objectively unreasonable factual determination. Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

In Williams, the Supreme Court cautioned that the "habeas corpus is not to be used as a second criminal trial, and federal courts are not to run roughshod over the considered findings and judgments of the state courts that conducted the original trial and heard the initial appeals." 529 U.S. at 383. Rather, the Williams court instructed district courts to "attend closely to those considered decisions, and give them full effect when their findings and judgments are consistent

17

with federal law." Id. (citing Thompson v. Keohane, 516 U.S. 99, 107-116 (1995)). In this regard, a federal habeas court must presume that a state court's finding of fact are correct, and petitioners bear the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); Jacobs v. Horn, 395 F.3d 92, 99 (3d Cir. 2005).

The Court of Appeals for the Third Circuit has qualified the application of these standards as follows:

> AEDPA's deferential standards of review do not apply "unless it is clear from the face of the state court decision that the merits of the petitioner's constitutional claims were examined in light of federal law as established by the Supreme Court of the United States." Everett v. Beard, 290 F.3d 500, 508 (3d Cir. 2002). In cases where the AEDPA standards of review do not apply, federal habeas courts apply pre-AEDPA standards of review. Id. Prior to AEDPA, federal habeas courts conducted a de novo review over pure legal questions and mixed questions of law and fact. Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001). In such circumstances, the state court's factual determinations are still presumed to be correct, rebuttable upon a showing of clear and convincing evidence under § 2254(e)(1). Id.

Jacobs, 395 F.3d at 100.

Thus, where the state court applied federal law, the Court shall consider whether or not such application was contrary to, or constituted an unreasonable application of, federal law under the AEDPA. In such cases, there is deference to both factual and legal determinations. Where the state court did not apply federal law as established by the supreme Court, the Court shall review its legal determinations de novo and presume its factual determinations to be correct, rebuttable upon a showing of clear and convincing evidence. With these principles in mind, the Court turns to the petitioners' arguments.

**B.**     **Sufficiency of the Evidence**

Petitioners contend that the State's evidence was not legally sufficient to establish their guilt of murder as accomplices and that the jury charge on that issue was flawed.  (Pb at 32-48, Point II.)  They argue the evidence failed to establish that, at any time prior to the robbery/murders, petitioners had even a foreboding that co-defendant Marseno was going to rob and murder the DeTournays, and that they allegedly engaged in certain acts antecedent to the robbery/murders, "with the purpose or knowledge in promoting or facilitating [those crimes]." (Id. at 43.)  In short, petitioners claim that while the evidence may support the acts in furtherance of a conspiracy to complete a multi-kilo cocaine deal, they cannot support actions related to the planing, promoting, or facilitating robbery or murder.

Accordingly, petitioners argue the Appellate Division's reinstatement of their murder convictions resulted in an unreasonable application of clearly established federal law, namely, In re Winship, 397 U.S. 358, 364 (1970), which requires that each element of a criminal offense be proved beyond a reasonable doubt.  (Pb. at 32-33.)  They argue the Appellate Division drew inferences from the evidence that no reasonable jury would have drawn to establish petitioners' guilt as accomplices.  (Id. at 33.)  They argue the Appellate Division unreasonably found that evidence of conspiracy to possess cocaine with intent to distribute also evidenced their accessorial liability for murder and robbery.  (Id. at 44.)  Thus, the Court must determine whether or not it was reasonable for the Appellate Division to hold that the evidence and inferences drawn therefrom were sufficient for a jury to find accessorial liability for murder and felony murder.

### i.        The Appellate Division's Rulings

On appeal, petitioners argued the State's evidence was insufficient to support a finding of accomplice liability because (1) Duckworth's and Lehman's testimony was insufficient to establish defendant Kamienski's presence at Alongi's house when the DeTournays were murdered (82a)[5]; (2) there was no evidence that Kamienski participated in planning the murders (83a); (3) there was no evidence that defendant Kamienski attended any of the meetings with the DeTournays where the subject of cocaine was discussed (id.); (4) Kamienski's guilt cannot be based on the argument that he shared in the proceeds of the robbery and helped dispose of the bodies (84a-85a); and (5) Kamienski's purpose cannot be inferred from the fact that on September 19, 1983, he drove Duckworth to a friend's house for the day (85a).

The Appellate Division held, first, there was no error in the jury instruction because, taken as a whole, the jury charge informed the jury it was obligated to consider all the evidence and the surrounding circumstances in deciding whether petitioners aided or assisted Marseno in robbing and killing the DeTournays, and whether they acted with the same purpose as Marseno. Kamienski, 254 N.J. Super. at 92-93.

Second, Appellate Division held that the jury's verdict of not guilty of a conspiracy to rob and murder was not inconsistent with its verdict of guilty of felony murder based on a killing during the course of a robbery and murder as accomplices. Id. at 93. It reasoned that "even though the jury found that the State failed to prove a conspiracy to rob or to murder, much of the evidence presented to establish such a conspiracy was also relevant to establishing Alongi and Kamienski's guilt as accomplices to Marseno in the commission of the substantive offenses of

_____

[5]Page numbers within petitioners' joint appendix shall be referred to as "__a."

20

murders and felony murders." Id. at 89 (citations omitted).

Third, and relatedly, the Appellate Division held the trial court erred in granting judgment N.O.V. Id. at 98. The court noted the trial judge's erroneous reasoning that the jury's acquittal of petitioners of conspiracy to rob and to murder precluded a verdict on accomplice liability. Id. It noted a further flaw in the trial court's reasoning that petitioners could only be charged "as accomplices and only on the basis of their actions during the commission of the crimes." Id. at 97, 98. The court held that accomplice liability may be proved, not only though direct evidence, but through circumstantial evidence and participation and acquiescence may be inferred from conduct, as well as spoken words. Id. at 99-100. The Appellate Division then summarized the evidence supporting accomplice liability against the petitioners and held that "the evidence against Alongi and Kamienski was sufficient for any rational jury to find them guilty of felony murder and murders." Id. at 107.

### ii.   **In re Winship** and **Jackson v. Virginia**

Petitioners argue the Appellate Division's decision constituted an unreasonable application of In re Winship, which holds that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." 397 U.S. at 364; see also Lambert v. Blackwell, 387 F.3d 210, 235 (3d Cir. 2004) (holding "Section 2254(d)(2) mandates the federal habeas court to assess whether the state court's determination was reasonable or unreasonable given that evidence" and, if it is unreasonable, "habeas relief is warranted."). When habeas corpus petitioner challenges the sufficiency of evidence supporting his criminal conviction, the Court must inquire:

21

> whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

Jackson v. Virginia, 443 U.S. 307, 319 (1979).  As the Jackson Court explained, circumstantial evidence by itself may suffice for a finding of guilt beyond a reasonable doubt.  Id. at 324-25.  In this regard, the Appellate Division stated:

> The standard for determining the sufficiency of the evidence requires us to view all of the evidence, both direct and circumstantial, in a light most favorable to the State and to consider all reasonable inferences which reasonably could be drawn from that evidence.  State v. Brown, 80 N.J. 587, 591-592, 404 A.2d 1111 (1979); State v. Reyes, 50 N.J. 454, 458-459, 236 A.2d 385 (1967).  "[T]he veracity of each inference need not be established beyond a reasonable doubt in order for the jury to draw the inference."  State v. Brown, supra, 80 N.J. at 592, 404 A.2d 1111; State v. DiRienzo, 53 N.J. 360, 376, 251 A.2d 99 (1969).  The sufficiency standard has been satisfied if we are able to conclude that any "rational trier of fact could have found the essential elements of the crimes" of murder and felony murder beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573, reh'g denied, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); State v. Marshall, supra, 123 N.J. at 136, 586 A.2d 85; State v. Martin, 119 N.J. 2, 8, 573 A.2d 1359 (1990); State v. Brown, supra, 80 N.J. at 592, 404 A.2d 1111.
> Our careful study of the record, in light of the appropriate standard, satisfies us that there is no basis to conclude that the jury verdict on the murders and felony murders constituted a "manifest denial of justice."  R. 3:20-1; see State v. Martinez, 97 N.J. 567, 571-572, 483 A.2d 117 (1984).  "Concerted action [as an accomplice] need not be proved by direct evidence of a formal plan to commit a crime, which was verbally agreed to by all who were charged.  Rather, the proof may be circumstantial and participation and acquiescence may be inferred from conduct, as well as spoken words."  State v. Gelb, supra, 212 N.J. Super. at 591-592, 515 A.2d 1246 (citing State v. Smith, 32 N.J. 501, 522, 161 A.2d 520 (1960), cert. denied, 364 U.S. 936, 81 S.Ct. 383, 5 L.Ed.2d 367 (1961)).

Kamienski, 254 N.J. Super. at 99-100.

### iii.   Elements of the Criminal Offenses

The criminal offenses at issue in this application are:  knowing or purposeful murder in violation of N.J.S.A. 2C:11-3a(1)(2) (Counts One and Two), and murder in the commission of a robbery in violation of N.J.S.A. 2C:15-1 (Count Five).  (A1-4.)

### a.   Murder

Defendant Marseno and petitioners Kamienski and Alongi were found guilty of murder in violation of N.J.S.A. 2C:1-3a(1) and (2).  The statute states:

> Except as provided in section 2C:11-4 criminal homicide
> constitutes murder when:
> (1)   The actor purposely causes death or serious bodily injury
> resulting in death; or
> (2)   The actor knowingly causes death or serious bodily injury
> resulting in death . . . .

N.J.S.A. 2C:1-3a.  One acts "purposely" where:

> it is his conscious object to engage in conduct of that nature or to
> cause such a result.  A person acts purposely with respect to
> attendant circumstances if he is aware of the existence of such
> circumstances or he believes or hopes that they exist.

N.J.S.A. 2C:2-2(1).  One acts "knowingly" if "he is aware that it is practically certain that his conduct will cause such a result."  N.J.S.A. 2C:2-2(2).  Thus, a "murder conviction based on 'knowing' conduct can result from conduct which is practically certain to cause serious bodily injury when death is a result fo the injury caused . . . [and] [s]imilarly, a murder conviction based on 'purposeful' conduct can result from the purposeful causing of serious bodily injury when death is a result of the injury caused."  State v. Martin, 213 N.J. Super. 426, 433 (App. Div. 1986).

### b.      Felony Murder

A defendant is guilty of felony murder if he, "acting either alone or with one or more other persons, is engaged in the commission of, or an attempt to commit, or flight after committing, or attempting to commit robbery, sexual assault, arson, burglary, kidnapping or criminal escape, and in the course of any such crime or of immediate flight therefrom, any person causes the death of a person other than one of the participants . . . ."  N.J.S.A. 2C:11-3a(3). Thus, the elements of felony murder are, essentially:  (1) a death of someone not participating in the underlying felony; that (2) occurred during the attempt, commission of, or immediate flight from, an underlying felony, which (3) is one of the felonies enumerated in the statute (e.g., robbery[6]); and (4) the underlying felony caused the death.

Intent to commit the underlying felony is sufficient to prove felony murder.  State v. Gerald, 113 N.J. 40, 88 (1988); see also State v. Darby, 200 N.J. Super. 327, 331 (App. Div. 1984) (holding "felony murder requires only a showing that a death was caused during the commission of (or attempted commission or flight from) one of the crimes designated in the statute.  The State need not prove that the death was purposely or knowingly committed; a wholly unintended killing is murder if it results from the commission of the underlying felony . . . a felony murder i.e., a death caused neither knowingly or purposely, is by definition not a result which is purposely planned."); State v. Stentson, 174 N.J. Super. 402, 407 (Law Div. 1980) (holding the intent element to the New Jersey felony murder rule "depends upon a theory of

---

[6]N.J.S.A. 2C:15-1 sets for the following elements of the crime of robbery:  (1) an actual theft is attempted or committed; (2) bodily injury, force, or threats are used to facilitate the commission of the theft; and (3) the bodily injury or threat activity happened in the course of the theft's commission or in immediate flight after the theft's attempt or commission.

transferred intent; intent to commit the felony is enough even through there is not intent to kill."). In short, a finding of guilt for felony murder does not require proof of intent to murder beyond a reasonable doubt.

N.J.S.A. 2C:2-3 sets forth the standard to determine whether or not the underlying felony caused the death. It states:

> a.      Conduct is the cause of a result when:
> (1)     it is an antecedent but for which the result in question
> would have occurred; and
>                                  . . .
> e.      When causing a particular result is a material element of an
> offense for which absolute liability is imposed by law, the element
> is not established unless the actual result is a probable consequence
> of the actor's conduct.

Thus, a predicate felony under N.J.S.A. 2C:11-3a(3) gives rise to felony murder only where it was the "but for" cause of death and the death was a probable consequence of the actors' conduct. See State v. Smith, 210 N.J. Super. 43, 55-56 (App. Div. 1986).

### c.      Accomplice Liability

Petitioners were convicted as accomplices to Marseno's murder of the DeTournays and felony murder. A person may be found guilty of an offense if it is committed "by the conduct of another person for which he is legally accountable . . . ." N.J.S.A. 2C:2-6a. Legal accountability exists when a person "is an accomplice of such other person in the commission of an offense." N.J.S.A. 2C:2-6b(3). A person is the accomplice of another when:

> [w]ith the purpose of promoting or facilitating the commission of
> the offense; he
> (a) Solicits such other person to commit it;
> (b) Aids or agrees or attempts to aid such other person in planning
> or committing it; or
> (c) Having a legal duty to prevent the commission of the offense,
> fails to make proper effort so to do.

N.J.S.A. 2C:2-6c(1); see also State v. White, 98 N.J. 122, 128-29 (1984) (holding "[b]y

definition an accomplice must be a person who acts with the *purpose* of promoting or facilitating

the commission of *the* substantive offense for which he is charged as an accomplice.").  Stated

differently,

> A defendant is guilty as an accomplice when "[w]ith the purpose of
> promoting or facilitating the commission of the offense; he . . .
> [a]ids or agrees or attempts to aid such other person in planning or
> committing it."  N.J.S.A. 2C:2-6c.  "[F]or accomplice liability to
> attach the defendant must have a purpose that someone else engage
> in the conduct which constitutes the particular crime charged."
> John M. Cannel, New Jersey Criminal Code Annotated, Comment
> 7 on N.J.S.A. 2C:2-6 (1996-97).

State v. Norman, 151 N.J. 5, 31-32 (1997).  In short, if a "defendant possesses "whatever

culpability is required for the substantive crime," and "the defendant . . . actually foresee[s] and

intend[s] the result of his or her acts," then he is guilty as an accomplice.  State v. Bridges, 133

N.J. 447, 456, 628 A.2d 270 (1993) (internal citations omitted).

### iv.    Analysis

The Appellate Division's holding does not represent an unreasonable application of

federal law under the AEDPA.  As set forth in the Appellate Division's discussion, see

Kamienski, 254 N.J. Super. at 100-05, there is evidence from which a reasonable jury could have

found efforts by Kamienski to facilitate the robbery and murder.  For example, Duckworth

testified about Kamienski's admission that he was present at the time of the murders.  She further

identified that knots used to tie the DeTournays' bodies as peculiar to Kamienski.  Based on this

evidence, and other evidence introduced at trial, a reasonable jury could have found Kamienski to

have introduced the DeTournays to Alongi and Marseno, arranged the September 19, 1983

meeting, ensured the absence of an eye witness – Donna Duckworth – who would normally have

been with him, furnished instrumentalities of the crime by supplying the blankets and a towel, was present during the murders and disposal of the bodies, assisted in disposing the bodies, took steps to ensure the secrecy of the crime (including alluding to physical harm to Duckworth if she told anyone what she saw), and partook in the fruits of the robbery and murders.

Evidence against Alongi further included Mr. Hunt's testimony that he saw Alongi with Nick DeTournay on September 19, 1983 at Alongi's residence and, shortly thereafter, replaced the carpet in his basement.  Moreover, Duckworth testified that she witnessed Alongi in the boat with the forms that looked like bodies on September 19, 1983, that he lunged at her but stopped when Kamienski told him she would not tell anyone, and that he subsequently threatened her if she told anyone what she saw.

While some of this evidence is circumstantial, the Appellate Division's holding that it, along with reasonable inferences drawn in favor of the prosecution, was sufficient for a rational jury to find petitioners guilty of felony murder and murder.[7]  The Appellate Division, therefore, did not unreasonably apply federal law in reinstating the jury's verdict.

The above-referenced evidence, and other evidence found in the record and noted by the Appellate Division, could reasonably support a finding of accomplice liability even absent evidence of an agreement necessary to support a conspiracy verdict.  Petitioners recognize that "jury verdicts finding defendants not guilty as conspirators but guilty as accomplices are not necessarily inconsistent . . . ."  (Pb at 44.)  See Nye & Nissen v. United States, 336 U.S. 613,

---

[7]The prosecutor's closing argument, which petitioners emphasize in their brief, does not change this analysis.  His tactical decision to focus his arguments on petitioner Kamienski's culpability for narcotics violations rather than intentional involvement in murder does not, of course, have any legal affect.  The State did not dismiss or abandon the murder charges and, if the evidence legally supports the conviction, the jury's verdict must be upheld.

619-620 (1949) (holding "[i]t is clear that failure to prove a conspiracy among A, B and C does not preclude a conviction on a count that A aided Y in committing a substantive offense."). The Appellate Division's reversal on this ground, therefore, was not contrary to, nor an unreasonable application of, federal law.

As to petitioners' arguments regarding the propriety of the jury instruction on accomplice liability, the Court notes that, "[a]s a general rule jury instructions do not form a basis for habeas corpus relief." Williams v. Lockhart, 736 F.2d 1264, 1267 (8th Cir. 1984). Indeed, jury instruction issues are normally matters of state law and are not cognizable in federal habeas corpus review. Henderson v. Kibbe, 431 U.S. 145 (1977); Chance v. Garrison, 537 F.2d 1212 (4th Cir. 1976); Manning v. Rose, 507 F.2d 889 (6th Cir.1974); Grecco v. O'Lone, 661 F. Supp. 408, 412 (D.N.J. 1987). Only where the giving of an instruction is so prejudicial as to amount to a violation of due process and fundamental fairness will a habeas corpus claim lie. 28 U.S.C. § 2254(a).

As the Appellate Division pointed out, the jury instructions with respect to accomplice liability were proper. Petitioners argue Judge Persekie's instruction that someone can become an accomplice before, during, or after the commission of the crime charged as long as the action that is taken as an accomplice is done with the purpose of promoting, facilitating, making easier or making possible, the commission or completion of the crime, was improper. (Pb at 38 (citing 20T at 59:7-66:2; 78:4-79:9.)) Petitioners appear to argue it was error to instruct that someone can become an accomplice after the commission of a crime. (Id.) As the Appellate Division noted, however, Judge Perskie instructed the jury, with respect to accomplice or conspiratorial liability for robbery, that:

28

> [T]he State would have to show that Alongi and Kamienski had the
> purpose of furthering or promoting the crime of robbery so that
> they would have to be aware of the fact of the crime of robbery and
> their conduct before or during the fact would have to be undertaken
> by them with the purpose of promoting the crime of robbery.

Kamienski, 254 N.J. Super. at 91-92.   It appears, therefore, that if the Judge indeed instructed

the jury that petitioners could have become accomplices after the fact, it was cured through a

subsequent express instruction.  Moreover, viewing the jury instructions as a whole, rather than a

statement by the judge in isolation, the Court finds that the Appellate Division's reversal did not

constitute an unreasonable application of federal law.

For all of the foregoing reasons, the Court holds that petitioners are not entitled to a writ

of habeas corpus based on their theory that evidence was insufficient to sustain the guilty

verdicts.

### C.    Jury Selection

Petitioners claim that the Appellate Division's rejection of petitioners' argument that the

jury selection process violated their Sixth and Fourteenth Amendment rights "involved an

unreasonable application of clearly established Federal law . . . and failed to extend a legal

principle from Supreme Court Precedent."  (Pb at 49-61, Point III.)  Petitioners challenge two

aspects of jury selection: the voir dire process, and the method of exercising juror challenges.[8]

The Court notes that petitioners fail to cite Supreme Court caselaw that contradicts the

---

[8]The State argues that the only arguments raised before the Appellate Division were
petitioners' arguments that the judge conducted improper voir dire and the sequential method of
peremptory challenges was unfair because they could not properly evaluate which juror to
challenge.  (Opp. Br. at 107.)  The Court is satisfied, however, based on the record, that the
issues presented here were sufficiently exhausted before the Appellate Division.  (See 148a-164a;
321a-324a.)

way the trial judge conducted the jury selection (and, therefore, the Appellate Division's affirmance). Petitioners cite Supreme Court caselaw for the general propositions that (1) the right to an impartial jury is guaranteed by the Sixth Amendment through the Fourteenth Amendment, Turner v. Murray, 476 U.S. 28, 36 n.9 (1986); voir dire enables the court to select an impartial jury and assists counsel in exercising peremptory challenges, Mu'Min v. Virginia, 500 U.S. 415, 431 (1991); courts should enforce a jury qualification method that promotes the exclusion of jurors infected with the prejudice of the community from which they come, Groppi v. Wisconsin, 400 U.S. 505, 509-510 (1971); and due process requires a jury capable and willing to decide a case solely on the evidence before it "and a judge ever watchful to prevent prejudicial occurrences and determine the effect of such occurrences when they happen," Smith v. Phillips, 455 U.S. 209, 217 (1982). They have not, however, cited established federal law that proscribes the complained of jury selection method or supports their arguments that it violated the Sixth or Fourteenth Amendments. Indeed, petitioners concede that the jury selection method is a matter generally left to the discretion of the trial court. (Pb. at 57-58.) This overarching deficiency in the petition warrants a denial of the relief sought. The Court now turns to petitioners' arguments.

### i.   Voir Dire

With respect to the voir dire process, petitioners argue (1) the voir dire took only three hours, making petitioners unable to develop sufficient information to intelligently exercise peremptory challenges or challenge for cause (Pb. at 50); (2) prospective jurors were permitted to answer voir dire questions in the presence of other jurors, rather than at side bar, exposing the rest of the jury to prejudicial information about pre-trial publicity and the jurors' personal experiences with people who have abused drugs, which was openly discussed before the pool of

potential jurors (id. at 50-52); and (3) the trial judge failed to adequately administer an instruction to cure the prejudice from the jurors' voir dire answers (id. at 52-53). The Appellate Division held that the exposure of the entire jury to the voir dire process of certain jurors did not violate petitioners' right to a fair trial. Id. at 109-110. The trial judge referred to the "educational process" of jury voir dire, which assists the parties in obtaining a fair and impartial jury. Id. at 109 (citing State v. Rios, 17 N.J. 572, 586-89 (1955)). For the following reasons, the Court finds this was not an unreasonable application of federal law.

First, the judge adequately reminded the jury of the presumption of innocence and the State's obligation to prove guilt beyond a reasonable doubt. (See, e.g., 3T at 27:5-28:9; 29:17-21; 29:23-30:4; 45:6-21.) The Court finds that these efforts insured against any prejudice that conceivably could have arisen from the voir dire process and, thus, weigh against a finding that the trial court's methods violated petitioners' rights to an impartial jury.

Second, it appears that the judge questioned the jurors as to whether or not they were capable of impartiality and that the attorneys had an opportunity to suggest voir dire questions. Cf. U.S. v. Addonizio, 451 F.2d 49, 65-66 (3d Cir. 1971) (holding trial court did not err in denying counsel the opportunity to examine prospective jurors, or in not examining each prospective juror individually out of the presence of the rest of the panel as to the content of articles he or she had read; the level of participation of counsel complied with the relevant rule, and choice of questions submitted by counsel was within trial court's discretion). Indeed, petitioners do not dispute the Appellate Division's findings that the jury was asked all pertinent questions suggested by counsel, and the trial judge was satisfied that the jurors who deliberated were fair and impartial. See Kamienski, 254 N.J. Super. at 110. The Court, therefore, does not

find the trial court's involvement of the attorneys, the length of the <u>voir dire</u>, or the practice of questioning the jurors in open court to constitute an unreasonable application of federal law. These are discretionary matters and the trial court's exercise of its discretion here did not unreasonably impinge upon petitioners' Sixth or Fourteenth Amendment rights.

Lastly, the petitioners argue the trial judge, and the Appellate Division through its affirmance, unreasonably applied federal law in allowing the open-court <u>voir dire</u> of jurors regarding their personal experiences with people who have abused drugs.  Petitioners recognize, however, that the method of voir dire generally a matter left to the discretion of the trial judge. (Pb. at 57-58.)  Moreover, the objected-to colloquy between the trial judge and the jurors did not relate to the petitioners, but rather to the personal experiences of prospective jurors.  The Court acknowledges that this was in part a drug trial and the personal experiences discussed were drug-related.  However, the Court agrees with the Appellate Division that the prospective jurors' responses to <u>voir dire</u> questions regarding personal experiences with drug abuse reflect "the reality of the society in which we live today."  <u>Kamienski</u>, 254 N.J. Super. at 109.  The jurors were not questioned as to whether or not they have ever read or heard anything about other people's experiences with drugs, nor could that reasonably form the basis for a for cause strike. The personal reasons for the excused jurors' partiality does not present a significant risk of tainting the remaining jurors; indeed, their excusal arguably educated the jury about the importance of impartiality.

### ii.     Peremptory Challenges

With respect to the method of exercising juror challenges, petitioners argue requiring a sequential method forced them to exercise challenges against a partially filled jury box, which

32

violated their Sixth and Fourteenth Amendment right to an impartial jury.  (Pb. at 53-56.)

The Court adopts in large part the reasoning of the Appellate Division with respect to petitioners' argument that the sequential method of administering peremptory challenges violated their Sixth Amendment Rights.  The method at trial went as follows:

> [A] one-for-one alternating method was followed in this case.
> Sequential rotation was followed which permitted each defendant
> to pass after a challenge by the State or co-defendant.  In that way
> it amounted to one defense challenge to one challenge by the State
> while the other defendants were free to pass.

Kamienski, 254 N.J. Super. at 112.

The Court finds this ground for relief unpersuasive, first and foremost, because federal law recognizes that the jury selection process is largely within the sound discretion of the trial court.  Indeed, petitioners fail to cite any binding caselaw that prohibits a "sequential" jury selection method such as the one used in petitioners trial.  Rather, they cite a range of circuit court opinions that recognize the discretion of the trial court but suggest methods other than the sequential method.  (Pb. at 58-59.)  Based on this authority, the Court is unsatisfied that the jury selection employed by the trial court was contrary to or constituted an unreasonable application of federal law.  See Mu'Min, 500 U.S. at 430-31 (holding "[t]he fact that a particular rule may be thought to be the 'better' view does not mean that it is incorporated into the Fourteenth Amendment.").  The Court therefore agrees with the State that the method of jury selection is a matter left to the discretion of the trial judge.  The Court's efforts to exercise that discretion did not constitute an unreasonable application of federal law.

Moreover, the trial court's purported error apparently resulted in no harm to petitioners whatsoever.  Petitioners argue their right to a fair trial was violated because the trial court

33

required them to exercise peremptory challenges during a round of challenges after one of their

co-defendants challenged a juror but before that excused juror's seat was filled.  They argue this

forced their attorneys to waste a challenge on a seated prospective juror that it would rather have

used against someone that subsequently filled an empty seat.  After 28 rounds of peremptory

strikes, however, petitioners had not exhausted all of their challenges.  See Kamienski, 254 N.J.

Super. at 111.  It is immaterial, therefore, whether or not petitioners exercised their challenges

without knowing who might occupy an empty seat because petitioners ultimately knew who

occupied that empty seat and chose not to strike them.  Thus, the trial court and the Appellate

Division did not unreasonably apply or misconstrue federal law in violation of petitioners' Sixth

or Fourteenth Amendment rights.

     For all of these reasons, the Court is unconvinced that the jury selection process involved

an unreasonable application of clearly established Federal law or failed to extend a legal principle

from Supreme Court Precedent.  The petition is therefore denied on this ground.

     **D.**    **Brady-Giglio Materials**

     Petitioners claim their Due Process rights were violated by the State's failure to disclose

Brady-Giglio[9] material.  (Pb. at 62-69, Point IV.)  Petitioners argue the State failed to disclose an

agreement, or informal understanding, between it and Donna Duckworth that, in return for her

testimony in the murder trial, she would receive concessions on an unrelated drug charge to

which she pled guilty.  (Pb. at 67.)  Alternatively, they argue there was an agreement that if she

---

     [9]Brady v. Maryland, 373 U.S. 83 (1963) (holding that prosecution's suppression of
accomplice's confession violated due process); Giglio v. United States, 405 U.S. 150 (1972)
(holding that a new trial was required because the government had not revealed a promise it
made to its principal witness that he would not be prosecuted).

did not testify, the State would seek incarceration rather than probation which was mentioned to her as a likely outcome in her case when she pleaded guilty.  (Id.)

The first basis for petitioners' April 10, 1997 motion for Post-Conviction Relief ("PCR") arose from concessions in connection with a prior arrest that Duckworth allegedly received in exchange for her testimony against Alongi and Kamienski.  In October 1985, Ms. Duckworth and Mr. Kamienski were arrested and charged with possession and possession with intent to distribute CDS.  (545a; 593a.)  Ms. Duckworth retained attorney Joel Miklacki.  (545a-546a;595a-601a.)  On or about February 19, 1986, Mr. Micklacki informed Duckworth that her application for admission into Pre-Trial Intervention ("PTI") had been rejected.  (602a-603a.)  On July 22, 1987, Ms. Duckworth pled guilty to the two charges in exchange for the prosecution's withdrawal of a civil forfeiture action and dismissal of the indictment against Kamienski.  On July 26, 1990, however (after she testified in petitioners trial), Ms. Duckworth was permitted to withdraw her guilty plea and, with the consent of the Ocean County Prosecutor's Office, was permitted to enter into PTI.  (639a-644a.)  Petitioners argued this chronology shows that Duckworth received concessions in exchange for her testimony and that the prosecution had never disclosed such an agreement.  (See 536a-555a.)

Petitoners' April 10, 1997 PCR motion was denied.  (745a.)  Petitioners appealed, contending they had made a showing that the State had suppressed Brady-Giglio material, especially since the State had never denied any agreement with Duckworth in a sworn document. (378a-428a.)  The Appellate Division stated "it is a fair inference, however, that discussions between the State and Duckworth's counsel must have occurred."  (514a.)  The court stated:

> We are persuaded that the State's answer to the PCR application,
> See R. 3:22-9, should have included affidavits or certification from

35

> representatives of the State with personal knowledge of the events
> in question.

(514a.)  The court vacated the denial of the vacatur motion and remanded the matter to permit the

State to file certifications that include:

> an explanation of the circumstances surrounding the July 1990
> concessions to Duckworth, their rationale and their relationship, if
> any, to her trial testimony, including whether they were the result
> of any promises to her.

(514a.)

On remand, then-prosecutor E. David Millard, who was the prosecutor for both

petitioners and Duckworth in her unrelated drug case, submitted a certification that recounted the

murder indictment, the unrelated drug charge, Duckworth and Kemienski's denial of PTI for the

unrelated drug charge, Duckworth's July 22, 1987 guilty plea to possession of a CDS with intent

to distribute, and the likelihood that she would receive probation given her lack of a criminal

record.  (751a-752a.)  He further certified as follows:

> 7.      In September, 1987 and prior to sentencing, Duckworth left
> her boyfriend Paul Kamienski in Florida and came up to New
> Jersey.  It was at this time that she told investigators the truth about
> her knowledge of the De Tourney murders and how she too had
> been threatened by the Defendants if she didn't keep her mouth
> shut.

> 8.      At no time did I make any promises, deal or otherwise
> induce Ms. Duckworth to testify against Kamienski and Alongi.  I
> further am unaware of any deals, or promises made by anyone else
> to induce Dona [sic] Duckworth to testify.

> 9.      On October 7, 1987 defendants Kamienski, Alongi and
> Marseino were indicted by an Ocean County Grand Jury for the
> September 19, 1983 murder of Henry and Barbara De Tourney.
> Duckworth had not yet been sentenced on the drug offense arising
> out of the pills found on Kamienski's boat.  Sentencing of
> Duckworth had been adjouned by the court after the homicide

36

indictment.

(752a.)  Prosecutor Millard then recited the procedural history of petitioners' case, including the

trial before Judge Perskie that spanned six weeks in October and November of 1988, Judge

Perskie's December 21, 1988 grant of petitioners' acquittal N.O.V., and the ensuing motions and

appeals that occurred over the next three and one-half years.  (752a-753a.)  He further certified:

> 14.    In the middle of this appeals process, in or about June or
> July of 1990 we became aware that the Duckworth drug case was
> still pending sentence.  As the trial attorney on the case, I agreed to
> Duckworth's entry into P.T.I.  This decision was not based on any
> deal or prior agreement.  Rather, on balance in the interests of
> justice, I believed it was the just course of action.  Over the course
> of the prosecution we had come to understand the extent to which
> Kamienski had dominated and used Duckworth.  I felt she was in a
> sense a victim of the overall situation.  Accordingly, a consent
> Order was entered and Duckworth, with the recommendation of the
> PTI authorities, was permitted to enter PTI.

In response, petitioners argued the certification was inadequate and that the Appellate

Division's order required certifications or affidavits from more than one person.  After hearing

oral argument, the Superior Court denied the petition without an evidentiary hearing.  (505a.)

Petitioners appealed (429a-493a), the Appellate Division affirmed the trial court (795a-806a),

and the New Jersey Supreme Court denied certification.

The principles of Brady v. Maryland, 373 U.S. 83 (1963), protect a defendant's right to

due process by requiring a prosecutor to disclose material exculpatory evidence to the defense.

Failure to do so, regardless of whether or not the omission was intentional, entitles defendant to a

new trial.  The "prosecutor's" obligation to disclose extends to "any favorable evidence known to

the others acting on the government's behalf in the case, including the police," Kyles v. Whitley,

514 U.S. 419, 438-39 (1995), and "exculpatory" evidence may include impeachment evidence,

such as cooperation agreements.  <u>Giglio v. United States</u>, 405 U.S. 150, 154 (1972).

The Supreme Court has described the materiality requirement to <u>Brady</u> evidence as follows:

> [The] touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important.  The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

<u>Kyles</u>, 514 U.S. at 434 (quoting <u>United States v. Bagley</u>, 473 U.S. 667, 678 (1985)).  The Court must, therefore, determine whether or not the state court properly applied federal law in its ruling regarding the alleged <u>Brady</u> materials.

First, this is not a case of failure to turn over evidence that bears on the credibility of the State's witness, Duckworth.  Rather, petitioners draw inferences from the timing of Duckworth's sentencing with respect to her testimony in the murder trial.  Based on those inferences, they appear to seek to investigate the veracity of the prosecutors' representations regarding whether or not Duckworth received anything in exchange for her testimony and the reason for their consent to PTI.  Thus, there has been no showing of a failure to disclose materials in derogation of <u>Giglio v. United States</u>.  For this reason, the Court does not find that the trial court or the Appellate Division's refusal to require the prosecutors to prove the non-existence of such an agreement through, for example, an evidentiary hearing was an unreasonable application of federal law.  The requirement that the prosecutor's office provide a certification was a reasonable safeguard to petitioners' right to a fair trial under the standards set forth in <u>Giglio</u>.

Second, the Court is satisfied that the trial court did not unreasonably apply federal law

when it found that prosecutor Millard's certification satisfied the Appellate Division's Order. The certification asserts that prosecutor Millard did not make any deals with Duckworth, and that he was not aware of any such deals by anyone else.  Petitioners claim that a prosecutor's representation that he was "unaware of any deals, or promises made by anyone else to induce Dona Duckworth to testify" left open the possibility that someone besides Millard made a deal with her.  They argue this is insufficient to satisfy Brady and Giglio.  While the Court recognizes that the duty to disclose Brady materials extends beyond the individual prosecutor, Kyles, 514 U.S. at 438-39, it also notes that Prosecutor Millard's certification affirmatively explains the reason for his agreement to allow Duckworth to enter PTI.  He stated that his concession "was not based on any deal or prior agreement," but on his knowledge of the extent to which Duckworth was dominated by petitioner Kamienski and that she "was in a sense a victim of the overall situation."  (753a.)  Given this affirmative statement regarding the genesis of the prosecutors' concession – namely, information obtained through the murder trial investigation – the Court finds the state court's treatment of the certification to be consistent with Brady and Giglio.

Third, Duckworth testified on direct examination that the State did not make her any promises or "any representations . . . in any fashion" regarding her plea on the unrelated drug charge.  Defendant had ample opportunity to cross examine her in this regard.  The only support for petitioners' theoretical deal between Duckworth and the prosecutors' office is the timing of her sentencing, i.e., after her testimony.  The Appellate Division recognized that the timing required at least a sworn explanation by the prosecutors' office, which was provided.  Beyond the affirmative explanation of the prosecutor's office's concessions, petitioners do not produce

39

sufficient evidence to raise cause for concern.  For this further reason, the Court is persuaded that the state court reasonably upheld the tenets of Brady and Giglio in adjudicating petitioners' applications regarding this issue.

### E.   Kamienski's Severance and Mistrial Applications

Petitioner Kamienski claims the denial of his severance and mistrial applications violated his right to a fair trial.  (Pb at 70-79, Point V.)  Kamienski argues these rulings violated the dictates of Bruton v. United States.  First, Kamienski argues that, pursuant to Bruton, the trial court's redaction of certain statements made in a September 9, 1983 telephone conversation prejudiced him.  Second, he argues the trial court improperly admitted evidence regarding Kamienski's "lifestyle," including recreational drug use and his tumultuous relationship with Duckworth.  He argues this Court should hold that the state court, while correct that the indictment supported a joint trial, failed to protect his right to a fair trial as events of the trial unfolded as required by Schaffer v. United States, 362 U.S. 511, 516 (1960).  (Pb. at 78-79.)

Kamienski moved to sever the trial on both these issues and the trial court denied his motions.  The Appellate Division addressed his arguments regarding severance as follows:

> Finally, the trial judge did not abuse his discretion in denying Kamienski's motion for a severance.  State v. Brown, 118 N.J. 595, 603, 573 A.2d 886 (1990).  Based on the allegations in the indictment, a joint trial was clearly appropriate.  State v. Moore, 113 N.J. 239, 273, 550 A.2d 117 (1988).

Kamienski, 254 N.J. Super. at 115.  Since the Appellate Division did not appear to apply the principles of Bruton v. United States, 391 U.S. 123 (1968) to petitioner's argument, the Court will apply the pre-AEDPA standard of review in considering petitioner's arguments here, see Marshall v. Hendricks, 307 F.3d 36 (3d Cir. 2002).

40

In Bruton v. United States, the Supreme Court held "that, because of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining petitioner's guilt, admission of [a co-defendant's] confession in this joint trial violated petitioner's right of cross-examination secured by the Confrontation Clause of the Sixth Amendment."  391 U.S. at 126.  In discussing the basis for this holding, the Supreme Court in Richardson v. Marsh, 481 U.S. 200 (1987) stated:

> Ordinarily, a witness whose testimony is introduced at a joint trial is not considered to be a witness "against" a defendant if the jury is instructed to consider that testimony only against a codefendant. This accords with the almost invariable assumption of the law that jurors follow their instructions, Francis v. Franklin, 471 U.S. 307, 325, n. 9, 105 S.Ct. 1965, 1976, n. 9, 85 L.Ed.2d 344 (1985), which we have applied in many varying contexts.  For example, in Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), we held that statements elicited from a defendant in violation of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), can be introduced to impeach that defendant's credibility, even though they are inadmissible as evidence of his guilt, so long as the jury is instructed accordingly. Similarly, in Spencer v. Texas, 385 U.S. 554, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967), we held that evidence of the defendant's prior criminal convictions could be introduced for the purpose of sentence enhancement, so long as the jury was instructed it could not be used for purposes of determining guilt.

481 U.S. at 206-07.  Bruton recognizes the prejudice that could befall defendants when a facially incriminating confessions of a nontestifying codefendant is introduced at their trial at their joint trial, even where the jury is instructed to consider the confession only against the codefendant.

The Bruton Court stated

> there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. Such a context is presented here, where the powerfully incriminating extrajudicial

> statements of a codefendant, who stands accused side-by-side with
> the defendant, are deliberately spread before the jury in a joint trial
> . . . .

391 U.S. at 135-36 (citations omitted).

In Richardson, however, the Supreme Court limited Bruton's reach and specifically declined to apply it to a codefendant's confession that did not directly implicate the defendant, but which required an evidentiary link. The court reasoned that "[w]here the necessity of such linkage is involved, it is a less valid generalization that the jury will not likely obey the instruction to disregard the evidence." Richardson, 481 U.S. at 208. The Richardson court, therefore, limited Bruton to confessions of codefendants that directly implicate the defendant.

### i.      The September 9, 1983 Telephone Conversation

Before trial, the trial court ruled that six statements would be admitted into evidence subject to redaction of any references to non-declarant defendants. One of the statements was attributed to Kamienski by Donna Duckworth. She testified about a September 9, 1983 telephone conversation that occurred when Nick DeTournay called Kamienski from Kamienski's boat. She stated Kamienski told DeTournay that "he didn't have a scale [to weigh drugs] and to get off the boat." (10T at 34:20-25.) Kamienski stated he was angry because someone was on his boat while he was not there. (13T at 230:19-23.) Originally, the statement included a reference to co-defendant Alongi that suggested he was also on Kamienski's boat with DeTournay during the call (9T at 85:7-9) but the trial court ordered that the reference to Alongi be deleted (2T at 204:4-206:16).

Kamienski argues that the redaction of a reference to Alongi being on his boat prejudiced him at trial. Duckworth testified that the blankets, sleeping bag, and towel that she either saw on

42

the boat behind Alongi's house on September 19, 1983, or which were found with the

DeTournays' bodies when they were recovered from Barnegat Bay and Sedge Island, were

similar to those she had seen on Kamienski's boat.  (11T at 62:25-64:17; 69:10-72:8.)  The

inference is that Kamienski, and not someone else, brought the towel, blanket, and sleeping bag

from his boat to the boat behind Alongi's house to wrap the bodies.  At trial, Kamienski's argued

the redaction of the reference to Alongi being on the boat prohibits him from rebutting this

inference with evidence that others had access to Kamienski's boat and, therefore, could have

taken the blankets and towel.  (9T at 84:13-16; 85:10-23.)  The trial court denied the application.

(9T at 98:1-5.)  Kamienski argues that the state court's treatment of the September 9, 1983

statement rendered his trial "fundamentally unfair."

In Zafiro v. United States, 506 U.S. 534 (1993), the Supreme Court held there is no

"bright line" rule regarding whether or not to sever a trial.  The Zafiro court did, however, offer

the following guiding examples:

> For example, evidence of a co-defendant's wrongdoing in some
> circumstances erroneously could lead a jury to conclude that a
> defendant was guilty . . . .  Evidence that is probative of a
> defendant's guilt but technically admissible only against a
> codefendant also might present a risk of prejudice.  See Bruton v.
> United States . . . .  Conversely, a defendant might suffer prejudice
> if essential exculpatory evidence that would be available to a
> defendant tried alone were unavailable in a joint trial.

506 U.S. at 539.  Petitioner essentially argues that the trial court's exclusion of the statement

containing the reference to Alongi being on his the boat on September 9, 1983 was unreasonable

because it included evidence exculpatory to Kamienski – namely, evidence that someone else

could have obtained the blankets that were implied to have been used to wrap the DeTournays'

43

bodies.  (Pb. at 76-78.)

The Court first notes that petitioner's arguments do not go to the state court's application of <u>Bruton</u>, but rather the denial of his motion for a severance, a decision widely regarded as within the sound discretion of a trial judge.  <u>See</u>, <u>e.g.</u>, <u>U.S. v. Hart</u>, 273 F.3d 363, 370 (3d Cir. 2001) (citing <u>Zafiro</u> and holding "[w]hether to sever a trial is left to the sound discretion of the district courts.").  The petitioner appears to argue, however, that the denial of his severance motions, coupled with the state court's ruling redacting the Duckworth statement, rose to the level of a constitutional violation.  In particular, he argues that, contrary to the teachings in <u>Zafiro</u>, the redaction of Duckworth's testimony excluded his exculpatory declarations that Alongi was on the boat with Nick DeTournay at the time of the September 9, 1983 telephone conversation and, thus, had access to the boat and the towel and blankets.  The plaintiff argues an inference could be drawn from the suppressed statement that others had access to Kamienski's boat and, therefore, the blankets that it was implied at trial were used to wrap the DeTournays' bodies were obtained by someone else.

However, the redacted reference to Alongi is not of the type that would so prejudice Kamienski that severance was required to preserve his right to a fair trial.  Kamienski's trial testimony directly contradicts the allegedly exculpatory statement he made to Duckworth.  He did not testify the blankets and towel were his but were obtained from his boat by someone else. Rather, he testified that the blankets <u>were not from his boat</u>.  (18T at 210:22-211:4.)  Thus, the theory that he now seeks to advance to rebut the inference that they were from his boat, is wholly inconsistent with his own testimony.  In short, petitioner apparently chose not to argue that the blankets were his but could have been taken from his boat by someone else.

44

Moreover, Kamienski had ample opportunity to develop the theory that even if the blankets were from his boat, someone else may have taken them.  Indeed, he was asked, and permitted to answer, whether or not Nick DeTournay told him during the September 9, 1983 telephone call who was with him on Kamienski's boat.  The colloquy went as follows:

> Q.      [Prosecutor] Let me ask you one other question about that phone call that you got back up in Garfield regarding the scale. Did Nick tell you who was with him?
>
> MR. RUSSELL:  Objection, your honor.
>
> THE COURT:  Overruled.
>
> A.      No, he did not.

(19T at 52:11-24.)  Kamienski also testified that others had access to his boat.  (19T at 47:6-9.) Nothing in the record indicates that he could not have further developed a theory that someone else could have taken blankets from his boat.  Thus, the absence of the redaction coupled with the denial of Kamienski's motions for severance did not render the trial "fundamentally unfair."

For these reasons, the Court finds that the state court's redaction of the Duckworth statement and the denial of Kamienski's severance motions were not inconsistent with, or an unreasonable application of, <u>Bruton</u> or <u>Zafiro</u>.

### ii.      The "Lifestyle" Testimony

Kamienski further argues that testimony by Duckworth and Arthur "Buddy" Lehman concerning Kemienski and Duckworth's lifestyle together was improper.  Specifically, Kamienski argues he was unfairly prejudiced by reference to his almost nightly "partying" with Duckworth, his absentee management of his family's lucrative New Jersey-based funeral business, their casual lifestyle in Florida and on Kamienski's boat, an incident in which

Kamienski allegedly threatened Duckworth with a knife in a New Jersey casino, and Kamienski's drug use and socializing with Buddy Lehman.  (Pb. at 74-75.)  Admission of this testimony, and denial of Kamienski's related motions for a mistrial, he argues, was contrary to United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 239 (1940) which held that appeals to class prejudice based on the accused's lifestyle are improper and may prejudice his or her right to a fair trial. (Pb. at 78-79.)  The State argues that everything elicited by the prosecutor on cross examination was brought forward by Kamienski on direct.  (Opp. Br. at 121.)  In this regard, the State references (19T at 26:15-26:18 – regarding the issue of money and income) and (19T at 19:4-13 – regarding the issue of drugs).

The Appellate Division summarily rejected petitioner's contention, finding it "completely without merit."  Kamienski, 254 N.J. Super. at 115.  It noted that "[w]e have examined the record with care respecting the prosecutor's conduct and find that he did not exceed the parameters of 'permissibly forceful advocacy' established by decisional law."  Id. (citations omitted.)

The denial of Kamienski's motion for a mistrial, and the Appellate Division's affirmance, were consistent with Saucony-Vacuum and, therefore, did not violate the AEDPA.  The purportedly prejudicial statements here were not as severe as the statements that the Supreme Court found to have been relatively benign in the Saucony-Vacuum case.  Moreover, petitioner points to no such impassioned argument in the state's opening or closing that incorporates testimony regarding Kamienski's income and drug use.  Moreover, the Court sees no "undignified and intemperate" use of the "lifestyle" information and finds that any "lifestyle" testimony elicited during the cross-examination of Kamienski's did not amount to an appeal to class prejudice.  In short, Kamienski's trial was not "dominated by passion and prejudice."

46

Saucony-Vacuum, 310 U.S. at 238.  Thus, the Court finds that the state courts' treatment of this issue was not contrary to, or an unreasonable application of, federal law.  The petition is, therefore, denied on this ground.

###   F.      Effectiveness of Petitioner Alongi's Counsel

Alongi argues he was deprived of counsel because (1) his application for counsel due to indigency had been denied and appealed but did not receive a decision in time to have made a difference (Pb. at 82); (2) he had filed motions that were never decided (id.); (3) his counsel, Miles Feinstein, Esq. was disqualified just before trial, requiring him to use a "surrogate" attorney – Jack Russell, Esq. (id.); and (4) petitioner Alongi argues Mr. Russell filed no pretrial motions that were decided by the trial court, he "botched" a bail reduction hearing, failed to participate in side-bar conferences, and failed to prepare a post-verdict motion for Judgment of Acquittal (id. at 82-83).  He argues the Appellate Division, in affirming the denial of his PCR motion on this ground, "unreasonably failed to extend the legal principals of Strickland to cover this case."  (Id. at 81.)[10]

---

[10]The Court has further considered several letters by petitioner Alongi, including a May 15, 2003 letter, a June 24, 2004 letter, and an undated letter "For: Corrective Procedural History and Supplementary Permission" (the "Supplemental Submission"), which he submitted to supplement the ineffective assistance of counsel argument in the petitioners' joint brief.  In the Supplemental Submission, Alongi argues (1) he told his appellate counsel to argue all of his points, including ineffective assistance of counsel, and the Appellate Court's decision did not discuss his arguments (id. at 6); (2) he was not present at a case management conference and a hearing and that attorney Miles Feinstein, Esq., who attended a recusal hearings, falsely represented that he had an attorney-client relationship with Alongi (id. at 9-10); and (3) when Alongi proceeded pro se, the trial court did not undertake to advise him of the perils he faces in represent himself (id. at 10-11); and (3) Jack Russell, Esq., the successor to attorney Feinstien, was "a fraudulent lawyer" (id. at 16-17) who did not proceed with each of the numerous motions and serve the 15 subpoenas that Alongi wished to be served (id. at 19) or properly investigate the case (id. at 19-20).  The Court has further considered the counter-arguments by the State as set

In Strickland v. Washington, 466 U.S. 668, 687 (1984), the Supreme Court held that a petitioner seeking to have his conviction overturned for ineffective assistance of counsel under the Sixth Amendment must show that (1) his counsel was defective, and (2) his defense was prejudiced by this defective performance.  See also Carpenter v. Vaughn, 296 F.3d 138, 149 (3d Cir. 2002).

The first prong of Strickland requires a showing that counsel made errors "so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the sixth amendment." Strickland, 466 U.S. at 687.  To obtain relief, petitioner must show that counsel's assistance fell below an objective standard of reasonableness considering all the circumstances.  Id. at 687-88.

The second prong of Strickland requires a showing that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  Strickland, 466 U.S. at 692.  Under this component, a petitioner must show "that there is reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A petitioner need not show that, but for counsel's deficiency, an alternative outcome would have "more likely than not," but rather he must show "a probability sufficient to undermine confidence in the outcome."  Id. at 693-94.  This standard is "not a stringent one." Jacobs, 395 F.3d at 105 (quotations omitted).

There is a strong presumption that defense counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  Strickland, 466 U.S. at 690.  To succeed in this application, petitioner Alongi must overcome this

---

forth in their appellate brief, which is located in their appendix at R6, pages 40-46.)

presumption and establish, <u>inter alia</u>, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  <u>Id.</u> at 694. Stated differently, a prisoner seeking habeas relief must "affirmatively establish[] the likelihood of an unreliable verdict."  <u>McAleese v. Mazurkiewicz</u>, 1 F.3d 159, 166 (3d Cir. 1993).

      While Alongi's petition raises several complaints about the way he was represented during the pretrial and trial phases of the state case, he fails to cite any specific prejudice. Indeed, after the trial, petitioner Alongi was granted a judgment of acquittal.  He makes no mention of deficiencies by appellate counsel, who represented him before the panel that reversed his judgment of acquittal and reinstated the guilty verdict.  He has made no showing that but for counsel's failures the outcome would have been different.  Thus, he does not meet the second element of the <u>Strickland</u> analysis because he has not demonstrated that any of the complained of conduct by counsel prejudiced him.  For this reason, petitioner Alongi's application based on ineffective assistance of counsel is denied.

## IV.    CONCLUSION

For all of the foregoing reasons, the petitioners' application for writ of <u>habeas</u> <u>corpus</u> pursuant the AEDPA, 28 U.S.C. § 2254(d), is **DENIED**.  Appropriate Orders will follow.

Dated: July 25, 2006

                                             /s/Stanley R. Chesler

                                           United States District Judge